## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

OSMOSE UTILITIES SERVICES, Inc.

        Plaintiff,

        v.

JUSTIN TOWNLEY; and MI-TECH
SERVICES, INC.

        Defendants.

Case No. _____

**VERIFIED COMPLAINT**
**JURY TRIAL DEMANDED**

### VERIFIED COMPLAINT

Plaintiff Osmose Utilities Services, Inc. ("OUS") brings this Verified Complaint for injunctive and compensatory relief against Defendants Justin Townley ("Townley") and MI-Tech Services, Inc. ("MI-Tech") (collectively "Defendants"), and in support thereof, states and alleges as follows:

### PARTIES

1.    OUS is a Delaware corporation with its principal place of business in Peachtree City, Georgia.  OUS is a citizen of the State of Georgia.

2.    Townley permanently resides at 20078 Linden Woods, Mora, Minnesota 55051, and therefore is domiciled in and a citizen of the State of Minnesota.

3.    MI-Tech is a Wisconsin corporation with its principal place of business in Fond du Lac, Wisconsin.  MI-Tech is a citizen of the State of Wisconsin.

### JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises, *inter alia*, under the laws of the United States, as it

1

involves violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.* and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et. seq.*

5.      This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship and the amount in controversy exceeds $75,000.

6.      The Court has supplemental jurisdiction of the state law claims arising from the Uniform Trade Secrets Act, Minn. Stat. § 325C.01 *et seq.* ("MUTSA"), and the common law claims of breach of contract and tortious interference with contract because these claims are related to the DTSA and CFAA claims over which the Court has original jurisdiction, and the related claims form a part of the same case or controversy under Article III of the United States Constitution.

7.      This Court has personal jurisdiction over the Defendants as Townley is a resident of the State of Minnesota, and MI-Tech possesses property and transacts business in the State of Minnesota through its Woodbury, Minnesota location, satisfying both Minnesota's long-arm statute and due process.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the activities giving rise to this litigation, including the execution of the contract at issue, occurred in this judicial district. Townley expressly agreed that OUS had the right to bring any action or proceeding in the court and jurisdiction of its choosing.

## FACTUAL BACKGROUND

9.      OUS was founded in 1934 and is a leading outsourced provider of technical, inspection, treatment and restoration services to electric utility and telecommunication owned structures across the United States. While Osmose offers various structure related services, Osmose's core business is the inspection and treatment of electric utility and telecommunication wood poles ("Pole Inspection and Treatment"). Osmose sustains its Pole Inspection and Treatment business through products and technology invented and maintained by Osmose, and proprietary processes and procedures that Osmose has developed over the last 85 years.

10.     In February 2011, Townley was hired by OUS as a Foreman in Osmose's Pole Inspection Treatment line of business.  In this position, Townley managed a crew of 2-3 employees and was responsible for managing the inspection of thousands of customers' utility poles annually.

11.     In 2014, Townley was promoted to Supervisor. As a Supervisor, Townley was responsible for managing between 6-8 Pole Inspection and Treatment crews (between 18-32 employees), which amounts to managing the inspection and treatment of 40,000-56,000 customers' poles annually.  He also was in a customer interfacing role responsible for project and data delivery, customer solicitation and assisting in making sales to grow the Pole Inspection Treatment business.  As a Supervisor, Townley received specialized training to perform the critical operational tasks and was intimately involved in managing Osmose's proprietary trade secrets used in its operations, including: its proprietary inspection and treatment techniques and processes; proprietary tools;

3

proprietary software to determine wood strength; proprietary data delivery software; and patented preservatives. Further, as Supervisor, Townley was privy to other trade secrets such as pricing, customer lists, customer contract terms, and other customer related confidential information.

12.     In consideration with his promotion to Supervisor, Townley executed a "Non-disclosure, Non-competition, Non-solicitation and Intellectual Property Agreement" (herein, "Non-Compete Agreement").

13.     In 2017, the "Non-Compete Agreement was updated and Townley executed the same in March 2017.

14.     The Non-Compete Agreement states: "Employer is engaged directly or through subsidiary and various affiliated corporations in various business activities, consisting generally of asset and data management and related services for utility and telecommunication companies, including without limitation: the inspection and maintenance of poles, steel towers, and pad mount transformers; pole and tower repair and restoration services; pole capacity and structural analysis services; storm damage services; infrared services; streetlight surveys; right of way vegetation management, data acquisition and mapping services; attachment surveys, network data capture and mapping, data enhancement, integration and migration, and related data, software and support services; and direct product sales related to the above services to electric, telephone, and gas line corporations, utilities, municipalities and cooperatives (collectively called "Employer's business")[.]"

4

15.     The Non-Compete Agreement further states: "Employee is employed by Employer and has been trained by Employer to perform important job functions relative to Employer's business and has acquired the knowledge of one or more trade secrets and other confidential information of Employer, as more fully described herein."

16.     By executing the Non-Compete Agreement, Townley agreed as follows: "Employee shall not, without Employer's express written permission reveal or otherwise make available to any other person any trade secrets or other confidential information concerning the Employer's business. Trade secrets and confidential information shall include, but not be limited to information concerning the make-up or formulas of Employer's products, Employer's customer lists, costs, pricing information, patterns, compilations, programs, devices and methods, computer data, drawings (engineering or otherwise), techniques or processes that (i) derive an independent economic value, actual or ascertainable by proper means, by other person who can obtain economic value from this disclosure and (ii) is the subject of efforts by the Employer that are reasonable under the circumstance to maintain its secrecy.  This provision shall survive the termination of this agreement for any reason."

17.     In Paragraph 6 of the Non-Compete Agreement, Townley further agreed that: "during Employee's employment with the Employer and for two (2) years following termination of Employee's employment with the Employer, including without limitation termination by the Employer for cause, without cause, Employee shall not, directly or indirectly, solicit or induce or attempt to solicit or induce any Employee, current or future, of the Employer to leave the Employer for any reason whatsoever, or hire any current or

future employee of the Employer. Employee acknowledges and understands this provision and agrees that the same is reasonable.  This provision shall survive the termination of this Agreement for any reason."

18.     Townley also agreed as follows:

> 3. During the period of two (2) years immediately following the expiration or termination of Employee's employment for any reason, Employee will not, either directly or indirectly, assist, engage in or be financially interested in any other business activity similar to or in competition with Employer's business or any part thereof in any State employee worked for the Employer including but not limited to: WI, MN.

> 4. During the period beginning on the date of this Agreement and ending two (2) years after the termination or expiration of Employee's employment for any reason, Employee will not, either directly or indirectly, (a) sell or attempt to sell any products or services competitive with Employer's products or services to any customer of Employer with whom Employee had material business dealings at any time during the last two (2) years of Employee's employment with Employer, or (b) suggest, advise or attempt to persuade any customer to limit or discontinue its business with Employer. This provision shall survive the termination of this Agreement for any reason.

> 5. Employee acknowledges that he is intimately aware of all facets of Employer's business.  This knowledge includes, but is not limited to, trade secrets and confidential information.  Employee further acknowledges that he fully understands the non-competition and non-solicitation set forth in Paragraphs 3 and 4 of this Agreement and agrees that said terms are reasonable, but agrees that, if any court of competent jurisdiction shall hold such restrictions unreasonable as to time, geographic area, activities, or otherwise, such restrictions shall be deemed to be reduced to the extent necessary in the opinion of such court to make them reasonable.

19.     Paragraph 7 of the Non-Compete Agreement states: "Any breach of the covenants contained in paragraphs 1, 2, 3, 4, 5, 6 and 8 hereof would result in irreparable injury to Employer for which it could not be adequately compensated by money damages, and Employer shall therefore be entitled to an injunction, in addition to, but not in

substitution of, all other legal remedies available to Employer, to be issued by any court of competent jurisdiction enjoining and restraining Employee from any violation or further violation of said covenants or any part thereof. If any action at law or equity is necessary to enforce or interpret any of the rights or obligations under this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which the prevailing party may be entitled."

20.     On May 14, 2019, Townley resigned his employment with OUS.

21.     Shortly thereafter, Townley began working for MI-Tech in its electric utility wood pole inspection and treatment line of business. Therefore, Townley is working for a direct competitor of OUS.

22.     Specifically, MI-Tech touts its pole inspection, capacity, and attachment services; structural analysis services; manhole inspection; and other maintenance services for the telecommunication, utility and energy industries. All of these services directly compete with OUS.

23.     Townley's employment with MI-Tech includes performing pole inspection and treatment work in Wisconsin, one of the prohibited geographic areas in the Non-Compete Agreement, and, upon information and belief, involves provision of services to OUS customers with whom Townley had direct contact during his tenure at OUS (including Xcel Energy) . It is also believed that Townley may have worked or intends on working on behalf of MI-Tech in other states covered by the Non-compete Agreement.

24.     Upon learning of Townley's employment with a direct competitor and his work in Wisconsin for OUS customers, OUS sent him correspondence on June 27, 2019,

which advised him of his obligations under the Non-Compete Agreement and demanded that he cease and desist from violating the same.

25.     Townley failed to respond to the letter.

26.     Based on the lack of response, OUS was forced to retain legal counsel who sent correspondence to Townley on July 15, 2019.

27.     Again, Townley did not provide any response.

28.     OUS, through counsel, also immediately contacted MI-Tech to advise it of Townley's obligations under the Non-Compete Agreement including his non-solicitation obligations.

29.     Despite knowing about the Non-Compete Agreement and its geographic scope, MI-Tech indicated that Townley "may very well" work in Wisconsin, Minnesota "or any other state for that matter." Based on this conversation with MI-Tech, it appears he also worked in Iowa for MI-Tech, another state he worked at while employed at OUS and therefore covered by the Non-compete Agreement.

30.     OUS maintains a confidential electronic application, Element, that it uses to track the location of OUS projects and crews.

31.     The Element application tracks crews and projects in various states and is used in interstate commerce.

32.     The Element application contains confidential information of OUS and is available only to OUS employees, which are provided access and login information.

33.     Former employees are not authorized to access OUS' Element application.

34.     As recently as July 2019, and following his resignation from OUS, Townley has intentionally accessed, without authorization, OUS's confidential Element application allowing him to gain information regarding the GPS location information on the whereabouts of OUS's projects and crews.

35.     Upon information and belief, Townley intentionally and without authorization accessed the Element application to track OUS crews for purposes of soliciting their employment at MI-Tech.

36.     Upon information and belief, Townley, as recently as August 21, 2019, reached out to OUS Pole Inspection and Treatment Foreman Bob Gueths in an attempt to solicit him to work for MI-Tech.

37.     Since Townley's resignation, at least 4 OUS Foreman and several crewman have resigned their employment and gone to work at MI-Tech, and many more have been contacted to leave Osmose for MI-Tech.

38.     Upon information and belief, the conduct of Townley and MI-Tech, including Townley's access of a protected computer program, has already cost OUS more than $75,000 in lost and usurped business opportunities, expenses associated with hiring and training employees to replace those wrongfully induced to leave OUS for MI-Tech, and attorneys' fees.

39.     In addition, upon information and belief, Townley's disclosure of OUS confidential information and trade secrets to MI-Tech has and will continue to irreparably disadvantage, damage, harm, and injure OUS's business.

40.     Specifically, critical to OUS's success and longevity is its creation of secret, proprietary processes, methods, software, and systems that make its services and products superior, unique, efficient, and cost-effective.  This is especially true in the Pole Inspection and Treatment line of business in which Townley worked for Osmose and now competes with Osmose as an employee of MI-Tech.

41.     OUS maintains the following information as its proprietary trade secrets: techniques and process in connection with poles inspection, pole strength determination, treating, data collection and data processing; preservative and other pole treatment related products; wood strength related software; training materials and processes; internally developed materials and inspection and treatment related aids; pricing; customer contract terms; marketing and go to market strategy; customer contacts; and other proprietary materials (collectively, "Trade Secrets").

42.     OUS has spent enormous time, resources, and capital to develop the content and knowledge that comprise the Trade Secrets and has consistently undertaken measures to maintain the secrecy of its Trade Secrets, including, but not limited to, requiring every employee whose position requires knowing and using Trade Secrets to sign a Non-disclosure, Non-competition, Non-solicitation and Intellectual Property Agreement (like that executed by Townley) prior to gaining access to the Trade Secrets, limiting the use of such materials by subject employees and restricting where such materials may be placed, and requiring clients and prospective clients to maintain the confidentiality and secrecy of Trade Secrets through non-disclosure agreements.

43.    As OUS's Trade Secrets have substantial economic value and drive its success, it will suffer immediate and irreparable harm and injury (for which there is no adequate remedy at law), including a severe competitive disadvantage, loss of customers and contracts, and loss of future customers and contracts, if they are being used by Defendants.

## COUNT I AGAINST TOWNLEY

### Violation of the DTSA
### 18 U.S.C. § 1836(b) *et seq.*

44.    OUS restates and re-alleges Paragraphs 1 through 43 of the Verified Complaint as if set forth fully herein.

45.    OUS is an owner of trade secrets related to its products and services, which products and services are used in interstate commerce.

46.    OUS took sufficient and reasonable steps under the circumstances to maintain the secrecy of its confidential information and Trade Secrets as set forth in Paragraph 42.

47.    OUS derives economic value, actual or potential, from its Trade Secrets not being generally known to, or readily ascertainable by proper means, by other persons who can obtain economic value from their disclosure or use.

48.    Townley knew that the Trade Secrets obtained through his employment at OUS were intended by OUS to be maintained in secrecy.

49.     Upon information and belief, certain of OUS's Trade Secrets identified in Paragraph 41 of this Verified Complaint have been or are threatened to be misappropriated by Townley by virtue of his employment with MI-Tech.

50.     Townley's blatant disregard of his contractual obligations under the Non-Compete Agreement, the immediacy with which he violated the Non-Compete Agreement, and his failure to respond to, much less deny, the statements in OUS's correspondence detailing his breaches of the Non-Compete Agreement along with his intentional and unauthorized access of OUS's confidential electronic application following his resignation confirm that any misappropriation is both willful and malicious.

51.     Upon information and belief, Townley's misappropriation of OUS's Trade Secrets constitutes a willful and malicious violation of 18 U.S.C. § 1836 that has caused or will cause immediate and irreparable injury to OUS for which there is no adequate remedy at law.

52.     In addition, OUS is entitled to an award of damages for actual loss and unjust enrichment for Townley's misappropriation of its Trade Secrets, exemplary damages in the amount of two times its damages for actual loss and unjust enrichment, and recovery of its reasonable attorneys' fees.

## COUNT II AGAINST TOWNLEY

### Violation of the MUTSA
### Minn. Stat. § 325C.01 *et seq.*

53.     OUS restates and re-alleges Paragraphs 1 through 52 of the Verified Complaint as if set forth fully herein.

54.     OUS's Trade Secrets constitute "trade secrets" as that word is defined in Minn. Stat. § 325C.01, subd. 5.

55.     OUS took sufficient and reasonable steps under the circumstances to maintain the secrecy of its confidential information and Trade Secrets as set forth in Paragraph 42.

56.     OUS derives substantial economic value, actual or potential, from its Trade Secrets not being generally known to, or readily ascertainable by proper means, by other persons who can obtain economic value from their disclosure or use.

57.     Townley, as an OUS employee, executed the Non-Compete Agreement and, by so doing, expressly acknowledged that he was "intimately aware of all facets of Employer's business," which included trade secrets.

58.     Townley expressly agreed to maintain the secrecy of such trade secrets and to not disclose them.

59.     Upon information and belief, Townley willfully and maliciously misappropriated the trade secrets of OUS by intentionally disclosing them to MI-Tech and/or using such Trade Secrets in the course of his employment with MI-Tech. Upon information and belief, he did so in order to obtain employment with MI-Tech and/or to advance his position and status within MI-Tech.

60.     As a result of Townley's conduct in violation of Minn. Stat. § 325C.01 *et seq.*, OUS has suffered or will suffer immediate and irreparable injury, including but not limited to severe competitive disadvantage, loss of customers and contracts, and loss of future customers and contracts; thus, entitling OUS to injunctive relief.

61.     Townley's misappropriation also entitles OUS to damages for actual loss and unjust enrichment, exemplary damages in an amount double its damages for actual loss and unjust enrichment, and recovery of its reasonable attorneys' fees.

## COUNT III AGAINST TOWNLEY

### Violation of the CFAA
### 18 U.S.C. § 1030(a)(5).

62.     OUS restates and re-alleges Paragraphs 1 through 61 of the Verified Complaint as if set forth fully herein.

63.     Townley intentionally and without authorization accessed and/or exceeded his authorized access to OUS' protected computer(s), namely its Element application.

64.     OUS' Element application constitutes a "protected computer" within the meaning of 18 U.S.C. §1030e(2) because it is used in and affect interstate commerce.

65.     Townley was not authorized, or exceeded his authorized access, knew he was not authorized to access or knew he was exceeding his authorized access to OUS' protected computer(s).

66.     Townley has violated the CFAA, 18 U.S.C. § a(2)(C) and/or a(5)(B) and (C).

67.     Townley's violations of the CFAA were committed for purposes of commercial advantage or private financial gain.

68.     Townley's violations of the CFAA have caused loss and damage to OUS, including, but not limited to, loss in excess of over $5,000 over a one year period, including reasonable costs associated with responding to Townley's violations, costs associated with investigating Townley's violations, and implementing corrective measures to prevent

14

future damage, lost employee productivity, costs of training replacement employees, and loss of OUS' competitive advantage in the marketplace and costs associated with bringing this action responding to Townley's violations.

69.     OUS is entitled to maintain this action seeking compensatory damages and equitable relief under 18 U.S.C. § 1030(g).

70.     As a result of Townley's CFAA violations, OUS has suffered and will continue to suffer loss and damages in an amount to be determined at trial.  In addition, Towley's misconduct caused, or will cause, loss of employees and goodwill for which there is no adequate remedy at law.

## COUNT IV AGAINST TOWNLEY

### Breach of Contract

71.     OUS restates and re-alleges Paragraph 1 through 70 of the Verified Complaint as if set forth fully herein.

72.     The Non-Compete Agreement is a valid and enforceable contract.

73.     At all times, OUS complied with its obligations under the Non-Compete Agreement.

74.     By executing the Non-Compete Agreement, Townley agreed not to disclose confidential information and trade secrets; not to directly or indirectly assist, engage, in or be financially interested in any other business activity similar to or in competition with OUS's business in any state where he worked for OUS (including, specifically, Wisconsin and Minnesota) for a period of two years after expiration of his employment; not to directly or indirectly sell or attempt to sell any services or products competitive with OUS's

15

services or products to any customer of OUS with whom he had contact during the last two years of his employment; and not to solicit or induce any OUS employees to leave OUS for any reason.

75.   Townley materially breached the Non-Compete Agreement by immediately accepting employment with MI-Tech, a direct competitor of OUS, and performing work on its behalf in Wisconsin and Iowa, and possibly other states, with OUS customers.

76.   Upon information and belief, Townley materially breached the Non-Compete Agreement by disclosing OUS's confidential information and Trade Secrets to MI-Tech.

77.   Upon information and belief, Townley materially breached the Non-Compete Agreement by directly or indirectly soliciting at least four OUS employees and inducing them to work for MI-Tech, including soliciting an employee on August 21, 2019.

78.   In executing the Non-Compete Agreement, Townley explicitly acknowledged OUS's entitlement to receive temporary and permanent injunctive relief to enforce the Non-Compete Agreement and that such relief may be granted without the necessity of proving actual damages.

79.   Townley further explicitly agreed that OUS has the right to claim and recover damages at law in addition to injunctive relief for breaches of the Non-Compete Agreement.

80.   As a direct and proximate result of Townley's material breaches, OUS has been damaged in an amount in excess of $75,000, the exact amount to be determined at

trial, and is entitled to recover its reasonable attorneys' fees, costs and necessary disbursements and any other legal or equitable relief.

## COUNT V AGAINST MI-TECH

### Tortious Interference with Contract

81.    OUS restates and re-alleges Paragraphs 1 through 80 of the Verified Complaint as if set forth fully herein.

82.    OUS has a valid and enforceable Non-Compete Agreement with Townley.

83.    Upon information and belief, MI-Tech knew of Townley's Non-Compete Agreement with OUS prior to offering him employment.

84.    Upon information and belief, MI-Tech intentionally procured Townley's breach of his Non-Compete Agreement by offering him employment, having him perform work in Wisconsin, having him solicit and perform work for OUS customers with whom Townley had a prior relationship at OUS, and aiding him in soliciting OUS employees to work for MI-Tech.

85.    MI-Tech knew as early as July 2019 that Townley was subject to a Non-Compete Agreement with OUS.

86.    MI-Tech intentionally procured Townley's continued breach of the Non-Compete Agreement by indicating that it would continue to have him perform work on its behalf in Wisconsin, Minnesota and "any other state for that matter."

87.    Upon information and belief, MI-Tech has also permitted and/or assisted Townley's solicitation of employees for work at MI-Tech, thereby further interfering with the Non-Compete Agreement.

17

88.    As a direct and proximate result of MI-Tech's interference, OUS has suffered and will continue to suffer loss and damages in an amount in excess of $75,000, the exact amount to be determined at trial.

89.    In addition, MI-Tech's tortious interference has caused or will cause OUS immediate and irreparable injury to OUS, including but not limited severe competitive disadvantage, loss of customers and contracts, and loss of future customers and contracts, for which there is no adequate remedy at law.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Osmose Utilities Services, Inc., respectfully requests that this Court:

(a)    Enjoin Defendant Justin Townley and all persons acting in concert with him, including but not limited to Defendant MI-Tech Services, Inc., from using, disclosing, or disseminating OUS's trade secret, confidential and proprietary information;

(b)    Order Defendants to immediately return all trade secret, confidential and proprietary information, data, documents, or other materials belonging to OUS in their possession, custody or control, regardless of format;

(c)    Order preservation of all evidence, including communications, emails, voicemails, and text messages between and among Defendants from January 1, 2019 to present;

(d)    Enjoin Defendant Townley from working for Defendant MI-Tech Services, Inc. in violation of his Non-Compete Agreement;

(e)     Enjoin Defendant Townley from soliciting employee's or customers of OUS in violation of his Non-Compete Agreement;

(f)     Enter judgment in OUS's favor on all claims against Defendants in an amount of compensatory damages to be determined;

(g)     Award OUS exemplary damages against Defendants in an amount double its compensatory damages, its attorneys' fees, statutory interest and costs of this suit as provided in the Non-Compete Agreement and applicable statutes;

(h)     Upon OUS's anticipated motion, allow OUS to amend this Verified Complaint to add a claim for punitive damages; and

(i)     Grant OUS such other and further relief as this Court deems just.

Respectfully submitted,

MESSERLI & KRAMER P.A.

Dated:  September 4, 2019        *s/ Kristy A. Fahland*
Kristy A. Fahland (#0346974)
1400 Fifth Street Towers
100 South Fifth Street
Minneapolis, MN  55402
Telephone: (612) 672-3600
kfahland@messerlikramer.com

ATTORNEYS FOR PLAINTIFF

## DECLARATION UNDER PENALTY OF PERJURY

On behalf of Plaintiff Osmose Utilities Services, Inc., as a Manager of Operations,

I verify under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true

and correct to the best of my knowledge.

Executed this 4th day of September, 2019

James W. Briggs

20